**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001091
16-NOV-2016
08:59 AM**

NO. CAAP-14-0001091

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE INTEREST OF R.K.; K.K.

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 14-00041)

SUMMARY DISPOSITION ORDER
(By:  Fujise, Presiding Judge, and Leonard, J.;
and Reifurth, J., dissenting)

Mother-Appellant appeals from the August 14, 2014 Order After Trial and the August 22, 2014 Orders Concerning Child Protective Act (**Orders Concerning CPA**) entered in the Family Court of the First Circuit (**Family Court**).[1]  Mother contends that the Family Court abused its discretion in awarding temporary foster custody of her minor children, RK and KK, (**Children**) to the Hawai'i Department of Human Services (**Department** or **DHS**) and challenges various rulings in the Order After Trial and the September 11, 2014 Findings of Fact and Conclusions of Law (**FOFs/COLs**).

---

[1]     The Honorable Bode A. Uale presided.

In her points of error on appeal, Mother contests the Family Court's rulings that were numbered 1, 4, 6, 7, 8, and 10 in the Order After Trial (these rulings were also included as FOFs 59 a, d, f, g, h, and j in the FOFs/COLs), as well as FOFs 77, 86, 117, 118, 120, and 121 in the FOFs/COLs.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's points of error as follows:

Hawaii Revised Statutes (HRS) § 587A-26 (Supp. 2015) provides, in relevant part:

> **§ 587A-26  Temporary foster custody hearing.**
>
> . . . .
> (c)  After reviewing the petition and any reports submitted by the department and considering all information pertaining to the safe family home factors, the court shall order:
>
> > (1)  That the child be immediately released from the department's temporary foster custody, placed in temporary family supervision, and returned to the child's family home with the assistance of services, upon finding that the child's family is able to provide a safe family home with services; or
> >
> > (2)  That the child continue in the department's temporary foster custody, upon finding that there is reasonable cause to believe that continued placement in foster care is necessary to protect the child from imminent harm; provided that in making this determination, the court shall consider whether:
> >
> > > (A)  The department made reasonable efforts to prevent or eliminate the need for removing the child from the child's family home before the child was placed in foster care;
> > >
> > > (B)  The alleged or potential perpetrator of imminent harm, harm, or threatened harm should be removed from the family home rather than continuing the child's placement in foster care. The child's family shall have the burden of establishing that it is in the child's best interests to remove the child, rather

than the alleged or potential perpetrator, from the family home; and

(C)     Every reasonable effort has been or is being made to place siblings or psychologically-bonded children together, unless such placement is not in the children's best interests.

The following standards apply to this court's review of the Family Court's rulings in this case:

> The family court's FOFs are reviewed on appeal under the clearly erroneous standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
>
> On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.
>
> However, the family court's determinations pursuant to HRS § 587-73(a)[2] with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the clearly erroneous standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001)

(citations, quotation marks, ellipses, and brackets omitted).

---

[2]     HRS § 587-73 (entitled Permanent plan hearing) was replaced in 2010 by § 587A-33 (Supp. 2011) (entitled Termination of parental rights hearing). The statutes are substantially similar in all relevant respects.

The Hawai'i Supreme Court has applied this deferential standard to its review of the award of temporary foster custody, stating:

> [T]he family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant, and its decision clearly exceeded the bounds of reason.

In Interest of Doe, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (citations, quotation marks, and brackets omitted).

As the Family Court concluded in part in its FOFs/COLs:

> 5. The purpose of the Child Protective Act, HRS Chapter 587A, is to make paramount the safety and health of the children who have been harmed, and to provide children with prompt and ample protection from the harms, as stated in the Child Protective Act, supra, with an opportunity for timely reconciliation with their families, if they can provide safe family homes, with timely and appropriate services or permanent plans to ensure the safety of the child. HRS § 587A-2. The Hawai'i Legislature made it clear that child safety is paramount. Id.

> 6. The Child Protective Act, supra, shall be liberally construed to serve the best interests of the child and the purposes of the Child Protective Act, supra. Id.

> 7. The Court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the Children may reasonably be expected to receive in the future. In re Doe, 95 Hawai'i 183, 191, 20 P.3d 616, 624 (2001). Woodruff v. Keale, 64 Haw. 85, 99, 637 P.2d 760, 769 (1981).

On January 9, 2014, Mother's three-year-old child, RK, suffered a life-threatening and life-altering brain injury, which is described in the Family Court's *unchallenged* FOFs as follows:

> 66. [RK] suffered a subdural hemorrhage with severe brain swelling, which is a serious, life-threatening injury.

> 67. When [RK] underwent a craniotomy to remove a part of his skull in order to relieve the pressure on his swelling brain, the surgeon directly observed the source of the bleeding in his brain to be a lacerated or torn vein.

> 68. Blood tests have ruled out a bleeding disorder as the cause of [RK's] brain injury.

4

69. A vascular malformation has been ruled out as a cause of [RK's] brain injury as no vascular malformations were observed by a CT scan of his brain in May 2013 or by direct observation of the surgeon during [RK's] craniotomy.

70. A metabolic disorder has been ruled out as a cause of [RK's] brain injury as [RK's] development has been normal.

71. At the time of his injury, [RK] was taking amoxicillin and tylenol to treat an ear infection. Both the ear infection itself and the medication he was taking were not related to [RK's] brain injury at all.

72. There is no medical condition that explains [RK's] brain injury.

73. [RK's] brain injury was caused by blunt force trauma to his head. This trauma occurred within a matter of a few hours prior to [RK] having seizures and losing consciousness. Following such a trauma, the bleeding in [RK's] brain would have caused deterioration in his functioning over time, including a worsening headache and a declining level of consciousness.

74. It is unlikely that [RK's] injury was caused by the hitting of his head on the stair rail on January 8, 2014 because of the described mild force with which [RK's] head struck the rail and more importantly, because of the described period of about 16 hours of normal, active, playful behaviors between the stair rail event and [RK] losing consciousness.

75. [RK's] vomiting on January 8, 2014 and January 9, 2014 is not necessarily medically associated with his brain injury. If the vomiting had been in combination with pain and abnormal behavior, then it would have been associated with his brain injury.

76. It is unlikely that [RK] had an existing injury that was exacerbated by hitting his head on the stair rail on January 8, 2014 and resulted in his subdural brain hemorrhage. If there was an old injury, it would have healed quickly and would not have been aggravated by a minor injury that occurred months later.

. . . .

78. [RK] has a severe residual brain injury, is unlikely to regain consciousness, and requires excessive and life long full time care. He currently receives hospice and urgent care services for twelve hours per day.

79. [RK] has extreme special needs due to his brain injury. He is vulnerable to child maltreatment due to his medical condition and complete dependence on adult caretakers to meet his needs.

. . . .

83. At the time of [RK's] brain injury, Mother was the primary caregiver for the Children.

84. At the time of [RK's] brain injury, the people who had access to [RK] outside of Mother's supervision were [Boyfriend] and [Boyfriend's] parents.

85. Mother is unable to identify the cause of [RK's] brain injury. Mother does not believe it is possible that someone may have caused [RK] brain injury.

. . . .

87. Mother has not been ruled out as the perpetrator of [RK's] brain injury.

As found by the Family Court, RK remains in a coma, receives hospice and urgent care services for twelve hours per day, and is expected to eventually die as a result of his injury.

At the time of RK's injury, RK and his twenty-month-old sibling, KK, were living with Mother and Mother's Boyfriend (**Boyfriend**) in the home of Boyfriend's parents, along with Boyfriend's parents and Boyfriend's three siblings. Boyfriend is not the Father of RK or KK. Although represented by counsel, the Father of RK and KK did not participate in the trial and, through counsel, notified this court that he did not wish to participate in this appeal.

In the days prior to RK's injury, he was sick and taking medicine for an ear infection. In the evening before RK's injury, the following reportedly occurred:

On the way down the stairs, [RK] walked into the wooden stair rail, hitting the left side of his head on the rail. Both Mother and [Boyfriend] describe the impact of [RK's] head on the stair rail as mild. [RK] grabbed the right side of his head and wobbled but did not fall down or lose consciousness. He did not cry or complain of pain.

RK vomited during and after dinner that evening, but Mother attributed it to his illness. The next morning, January 9, 2014, RK was active and playful before breakfast, vomited

6

after eating, but then continued to run around and play, and behaved consistently with his behavior over the previous few days. Mother was home alone with RK and KK. The unchallenged FOFs describe what reportedly happened next as follows:

> 22. [RK] went to [Boyfriend's] upstairs bedroom where he watched television and took his usual morning nap at about 10:30 to 11:00 a.m.
>
> 23. [Boyfriend's] mother and sister came home and went upstairs. Shortly thereafter, at about 12:00 to 12:30 p.m., Mother and [KK] went outside to hang laundry. [RK] remained upstairs.
>
> 24. A couple of minutes later, [Boyfriend] came home. Upon his arrival, he heard [RK] crying and went upstairs. [Boyfriend's] mother was standing outside the door to his bedroom, asking [RK] if he was alright. [RK] was on the ground in [Boyfriend's] bedroom, where he normally naps.
>
> 25. [Boyfriend] saw [RK's] eyes roll back and his body stiffen up. [Boyfriend] hit [RK's] leg to try to get his attention and sat him up on the bed before letting him go to turn on the fan. [RK] lay back and stiffened up again. Both of his arms were stiff his eyes were rolling back, and he appeared to be having a seizure.
>
> 26. [Boyfriend] tried to revive [RK] by slapping him on the face, but he didn't wake up.
>
> 27. [Boyfriend] alerted Mother to [RK's] condition and they called 911 for help.
>
> 28. Emergency Medical Services arrived at the home at about 12:30 p.m. [RK] was unresponsive and was transported by ambulance to the Queens Medical Center. While in the emergency room, a CAT scan was done and then [RK] was taken into surgery to remove part of his skull in order to relieve some of the pressure from his swelling brain. He was later transferred to the Kapiolani Medical Center for Women and Children [(KMC)].

When asked questions at trial regarding why her children were in foster care, Mother testified that "we didn't intentionally do anything to them." She further testified that she had no idea what may have caused his injury and expressly denied causing the injury. Boyfriend also testified that he did not cause and had no idea what might have caused RK's injury and,

like Mother, he does not believe that someone may have caused the harm to RK.

Gina French, M.D. (**Dr. French**) was found by the Family Court to be qualified as an expert in the fields of pediatrics and child abuse and to be a credible witness. Dr. French's opinions as expressed in two reports, as well as her trial testimony, were made to a reasonable medical certainty. Although Mother challenges key findings based on the medical testimony given by Dr. French – including that RK's injury was not caused by the hitting of his head on the stairway railing the evening of January 8, 2014 that RK's vomiting was not significant to the cause of his injury, that the severe injury that happened to RK happened within hours of him beginning to have seizures and lapsing into a coma — she does not challenge Dr. French's qualifications. No other medical testimony was offered at trial.

Dr. French testified, *inter alia*, that RK's injury, which included a large tear in a major vein coming off of his brain, was "most likely caused by some blunt trauma, something hitting his head" and that it likely happened close in time to when he collapsed, rather than 16 hours earlier. She explained that, with such a devastating injury, although there were a few cases where someone was lucid for a period of time and not comatose, those children "were clearly severely in pain and injured and not right." Based on RK's surgeon's direct observation of RK's bleeding and a prior CT scan, the possibility of abnormal vessels or brain size was eliminated. Dr. French

8

testified that she looked hard to identify any possible medical condition that could explain RK's injury and found none. Based on the medical evidence, she opined that RK likely received a hard blow to his head within a short period of time before his collapse. Based upon the entire record, as well as Dr. French's testimony and reports, we conclude that the Family Court did not err finding her testimony to be trustworthy, credible, and made to a reasonable medical certainty.

Mother challenges the Family Court's initial ruling that "given the evidence adduced at Trial and the proximity of [Mother] and [Boyfriend] to the child when his severe brain injury occurred, the Court identifies both of them as perpetrators of harm to [RK]" and the court's later finding that "Mother and [Boyfriend] have not provided an adequate explanation for [RK's] brain injury. There is no identified perpetrator of [RK's] brain injury." However, the former finding was made in the context of the Family Court's ruling that RK was harmed due to acts and/or omissions of his family, specifically Mother and Boyfriend, who had no adequate explanation for what the court determined to be a severe brain injury caused by a blunt force hit to his head. The latter finding highlighted that Mother and Boyfriend had not provided an adequate explanation for RK's grievous injury and no one identified who inflicted the blunt force injury. Although the specific wording of the Family Court's findings could have been clearer, reading the entirety of

the court's decision and the record of this case, we cannot conclude that the Family Court's FOFs were clearly erroneous.

Thus, RK was severely injured by someone while in Mother and/or Boyfriend's care. Neither Mother or Boyfriend could be ruled out as the perpetrator of the harm. After interviews and investigation, a Multidisciplinary Team, including Dr. French, held a conference over the course of two days and concluded, *inter alia*, that Mother and Boyfriend were inadequate caretakers for RK and KK, and recommended that the Children be removed from the family home. RK now has extreme special needs due to his medical condition. Given the blunt force injury suffered by RK, KK's vulnerability due to his young age and complete dependence on adult caretakers, the Family Court found that it was not in the best interest of the Children to be returned to the care of Mother and Boyfriend. We conclude that the Family Court did not clearly err in its FOFs and did not abuse its discretion in granting DHS's motion petition for temporary foster custody in this case.

Therefore, the Family Court's August 14, 2014 Order After Trial and August 22, 2014 Orders Concerning CPA are affirmed.

DATED: Honolulu, Hawai'i, November 16, 2016

On the briefs:

Herbert Y. Hamada,
for Mother-Appellant.

Mary Anne Magnier,
Erin K.S. Torres,
Deputy Attorneys General,
for Petitioner-Appellee.

Presiding Judge

Associate Judge